Agustín **CAMPOSECO–MONTEJO,** Petitioner,

v.

John **ASHCROFT, Attorney General, Respondent.**

No. 02–74259.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 14, 2004.

Filed Sept. 17, 2004.

Sharon L O'Grady, Pillsbury Winthrop LLP, San Francisco, CA, for the petitioner.

Rena I. Curtis, Office of Immigration Litigation, Civil Division, U.S. Department of Justice, Washington, D.C., for the respondent.

Before THOMPSON, TASHIMA, and RAWLINSON, Circuit Judges.

TASHIMA, Circuit Judge.

Agustín Camposeco–Montejo ("Camposeco"), a native and citizen of Guatemala, petitions for review of a decision of the Board of Immigration Appeals ("BIA" or "Board"), affirming without opinion the decision of the Immigration Judge ("IJ"). The IJ denied Camposeco's application for asylum, withholding of removal, and for relief under the Convention Against Torture,[1] but granted voluntary departure. The denial of asylum was based on the IJ's determination that Camposeco had firmly resettled in Mexico. We have jurisdiction pursuant to 8 U.S.C. § 1252, and we grant the petition.

## BACKGROUND

 Camposeco is a Jacalteco Mayan Indian who had many family members brutally tortured and murdered by the Guatemalan army during the 1980's.[2] His father, Gaspar Camposeco ("Gaspar"), was accused by the army of being a guerrilla because he was a "catechist" in the Catholic church. The army threatened to kill Gaspar and often went to the family's house to look for him, destroying the family's possessions and killing their pets when they did not find him. On one occasion, the army tied up Camposeco's mother and threatened to take her away if she did not turn in Gaspar. Two of Gaspar's cousins were tortured by the army; only one survived. Gaspar's brother and Camposeco's mother's brother also were murdered by the army. Gaspar fled to Mexico in 1982, followed a few months later by his wife

---

1. Camposeco does not appeal the IJ's denial of relief under the Convention Against Torture.

2. Because neither the BIA nor the IJ made an adverse credibility finding, Camposeco's testimony is deemed to be true. *Ruano v. Ashcroft,* 301 F.3d 1155, 1159 (9th Cir.2002).

and children, including Camposeco, who was nine years old at the time.

Camposeco and his family initially were returned to Guatemala by the Mexican government, which was unprepared for the mass exodus of refugees.[3] They, nonetheless, later returned to Mexico, after which Camposeco and his family lived in tents in a refugee camp near the Guatemalan border for one to two years, until they were able to build small houses in the camp, using tin roofing material donated by a church. Life was difficult in the camps, where there was no potable water, and the water they did use often was contaminated by bodies dumped into the river by the Guatemalan Army. The refugees were not allowed to attend Mexican schools, and there were no schools in the refugee camps for many years. Camposeco's family was forced to stop wearing their traditional clothes in the camps, in order to avoid discrimination.

Approximately a year after Camposeco's family arrived in Mexico, COMAR issued to adult refugees an immigration document called an FM8, which allowed the refugees to live and work in the municipalities in which their camps were located. The refugees were not permitted to leave the municipality in which they lived, however, under threat of repatriation to Guatemala. Minors did not receive the FM8, but were included in the card received by their parents. When Camposeco was a teenager, he attempted to travel to a neighboring municipality but was caught by Mexican immigration authorities, who locked him in a bathroom, demanded money from him, and threatened to deport him to Guatemala.

In 1994 or 1995, Camposeco entered into a common-law marriage with a woman who lived in a refugee camp in the same municipality as Camposeco's. His wife and daughter still live in the municipality of Trinitaria, in Mexico. In 1996, COMAR began to issue an FM3 immigrant card, which allowed the refugees to travel outside the municipality in which the refugee camp was located. Camposeco received his FM3 card in 1997.

After receiving his FM3 card, Camposeco left Chiapas to travel to the United States. When he arrived in Sonora, officials detained him and asked for his documents. He produced his FM3 card, but they asserted that it was not genuine and charged him 600 pesos before allowing him to go. Camposeco was left without enough money to continue his journey. He eventually entered the United States in 1998.

Camposeco did not know of the possibility of applying for asylum until he was detained by the Immigration and Naturalization Service[4] ("INS") in the state of Washington in 1999. He applied for asylum in 2000, detailing on his application the many horrors suffered by his family in Guatemala.

At the hearing before the IJ, Camposeco, his brother, and his sister testified about their experiences in Guatemala and Mexico. Dr. Jeffrey Kaye, an expert in psychology, testified about the effects on Camposeco of the trauma he had suffered.

Camposeco also presented the testimony of Michael Smith, the coordinator of the

---

**3.** Because of the large numbers of Guatemalans fleeing to Mexico, the Mexican government eventually formed a commission to address the situation, the Comisión Mexicana de Ayuda a Refugiados ("COMAR").

**4.** The INS has been abolished and its functions transferred to the Department of Homeland Security. *See* Homeland Security Act of 2002, Pub.L. No. 107–296, 116 Stat. 2142 (2002), 6 U.S.C. §§ 101–557. We will refer to the government agency as the INS.

Affirmative Asylum Program at the East Bay Sanctuary in Berkeley, California. Smith testified as an expert regarding the immigration documents given to the Guatemalan refugees by the Mexican government. Smith described Mexico's treatment of the Guatemalan refugees and the differing rights conferred by the three types of immigration documents they received—the FM8, FM2, and FM3 cards. After Mexico's initial hostile reaction toward the refugees, COMAR began to issue the FM8, which allowed the refugees to live and work in the municipalities in which the refugee camps were located. Nevertheless, "[s]ome officials didn't recognize those documents and turned people over to the Guatemalan authorities." In 1996, COMAR began to issue an FM2 to the refugees; however, the state of Chiapas, where Camposeco lived, issued an FM3 instead. Both cards needed to be renewed every year. The FM3 conferred several rights upon the refugees, the most important of those being the right to travel outside their municipalities and the right to work. The FM2 conferred the same rights as the FM3, with the significant distinction of also allowing the refugees to apply for permanent residency after five renewals.

The IJ denied Camposeco's application for asylum, withholding of removal, and for relief under the Convention Against Torture. The IJ briefly described some of the horrors of Camposeco's experience in Guatemala and noted Dr. Kaye's "vivid" testimony of Camposeco's "psychological trauma, which continues to manifest itself to this day," resulting from the "atrocities" Camposeco experienced. The IJ, however, concluded that Camposeco was firmly resettled in Mexico and accordingly denied his application for asylum, based on the

"critical evidence" provided by Michael Smith. The IJ mistakenly believed that Smith had testified that FM3 holders were "allowed permanent residence." The IJ further reasoned that Camposeco had experienced "16 years of peaceful residence in Mexico," providing another basis for a finding of firm resettlement in Mexico.[5] The IJ denied Camposeco's application for withholding of removal, reasoning that there was "no reason to believe that the government of Guatemala at this time would have any interest in a respondent who was approximately seven years of age when he left Guatemala in 1982." The IJ granted Camposeco voluntary departure. The BIA affirmed without opinion pursuant to 8 C.F.R. § 3.1(e)(4) (now found at 8 C.F.R. § 1003.1(e)(4)). Camposeco filed a timely petition for review.

## STANDARD OF REVIEW

■ Where the BIA adopts the decision of the IJ as the final agency determination of the case, we review the decision of the IJ. *Vukmirovic v. Ashcroft,* 362 F.3d 1247, 1251(9th Cir.2004); *see Falcon Carriche v. Ashcroft,* 350 F.3d 845, 851 (9th Cir.2003). The denial of asylum is reviewed for substantial evidence. *Kataria v. INS,* 232 F.3d 1107, 1112(9th Cir.2000). The denial must be upheld unless the applicant can show that "the evidence he presented was so compelling that no reasonable factfinder could fail to find the requisite fear of persecution." *INS v. Elias–Zacarias,* 502 U.S. 478, 483–84, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992).

## DISCUSSION

■ Camposeco challenges the IJ's denial of his application for asylum. He

---

**5.** The IJ declined to reach the issue of Camposeco's failure to comply with the one-year deadline for filing an asylum application, found in § 208(a)(2)(B) of the Immigration and Nationality Act, 8 U.S.C. § 1158(a)(2)(B), because of his conclusion that Camposeco's firm resettlement in Mexico rendered him ineligible for asylum.

applied for asylum pursuant to Immigration and Nationality Act ("INA") § 208(b)(1), 8 U.S.C. § 1158(b)(1), which gives the Attorney General discretion to grant asylum to an alien who is a refugee within the meaning of 8 U.S.C. § 1101(a)(42)(A). 8 U.S.C. § 1158(b)(1). A refugee includes a person who is unable or unwilling to return to his native country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). Camposeco also challenges the denial of withholding of removal. Under INA § 241(b)(3), "the Attorney General may not remove an alien to a country if the Attorney General decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3). "Unlike asylum, withholding of removal is not discretionary." *Al–Harbi v. INS*, 242 F.3d 882, 888 (9th Cir.2001) (citation omitted).

### I. Firm Resettlement

An application for asylum must be denied if the alien has firmly resettled in another country. 8 C.F.R. § 208.13(c)(2)(B). Subject to two exceptions, an alien has firmly resettled if, "prior to arrival in the United States, he or she entered another country with, or while in that country received, an offer of permanent resident status, citizenship, or some other type of permanent resettlement." 8 C.F.R. § 208.15.

Camposeco contends that the IJ's conclusion that he has firmly resettled in Mexico is not supported by substantial evidence. Camposeco argues first that the IJ misunderstood the testimony of his expert witness, causing him mistakenly to conclude that Camposeco received an offer of permanent resettlement from Mexico. Camposeco further argues that he did not resettle in Mexico because he did not experience a lengthy, undisturbed residence there. Finally, Camposeco contends that, even if he did receive an offer of permanent resettlement in Mexico, the two regulatory exceptions to firm resettlement apply to him.

■ An alien has firmly resettled within the meaning of 8 C.F.R. § 208.15 if a third country in which the alien has resided after becoming a refugee offers him permanent resettlement. *Andriasian v. INS*, 180 F.3d 1033, 1043(9th Cir.1999). "In the absence of direct evidence of an offer [of permanent resettlement], a lengthy, undisturbed residence in a third country may establish a rebuttable presumption that an individual has the right to return to that country and remain there permanently." *Id.* (citation omitted).

### A. Offer of Permanent Resettlement

The IJ concluded that Camposeco received an offer of permanent resettlement and thus was firmly resettled in Mexico based on the testimony and declaration of Michael Smith. Smith testified that the government of the state of Chiapas, where Camposeco was located, was more reluctant than other states in Mexico to grant any type of permanent status to the refugees. Thus, beginning in 1996, when other states granted the refugees an FM2 card, Chiapas issued an FM3, which did not confer the right to apply for permanent residency. Refugees such as Camposeco who received an FM3 in Chiapas, therefore, were not eligible for permanent residency. Smith further testified that Chiapas eventually began to issue FM2's but not until 1998 or 1999.

■ The IJ's conclusion that Smith's testimony supports a finding of firm resettlement is not supported by substantial

evidence. First, the IJ mistakenly stated that Smith testified that, "in 1999, FM3 holders were allowed permanent residence." This is not, however, what Smith testified. Rather, he stated that, "starting in 1998 or 1999, in the state of Chiapas, then they did begin an FM2 program. Now, many of the camps received their first FM2 in 1999." Thus, refugees who were in Chiapas in 1999 may have received an FM2; Camposeco, however, received an FM3, which does not confer the right to apply for permanent residency.

The IJ also found particularly compelling the fact that " 'FM3 holders who illegally enter the United States and later return to the camps can renew their FM3's, but have no right to FM2's.' " The significance of this statement is not clear. All it means is that Camposeco may be able to renew his FM3 but, again, this does not confer the right to apply for permanent residency. Camposeco accordingly has not received an offer of permanent resettlement within the meaning of 8 C.F.R. § 208.15.

## B. Lengthy, Undisturbed Residence

■ Besides the mistaken conclusion that Camposeco had received an offer of permanent resettlement by virtue of receiving his FM3 card, the IJ further reasoned that Camposeco's "16 years of peaceful residence in Mexico ... may apply" to establish firm resettlement. Camposeco argues that his stay in Mexico was not lengthy and undisturbed, but rather was "characterized by restrictions on residence, travel, ownership of land, and education, and by suppression of[my] culture. [I] suffered threats of deportation to Guatemala and officially sanctioned extortion."

Although a "lengthy, undisturbed residence in a third country may establish a rebuttable presumption" of resettlement, we have held that the presumption did not arise where the petitioner received at least one death threat and faced frequent harassment in the third country to which he fled. *Andriasian*, 180 F.3d at 1037–38, 1043. We noted that the petitioner's stay in the third country was "disrupted by harassment, discrimination, and threats to personal safety, and at times by the need to flee such treatment," rather than undisturbed; the presumption of resettlement accordingly did not arise. *Id.* at 1043.

By contrast, in *Cheo v. INS*, 162 F.3d 1227 (9th Cir.1998), the petitioners fled Cambodia for Malaysia, where they lived for three years "without any molestation or persecution." *Id.* at 1228; *see also Vang v. INS*, 146 F.3d 1114, 1115–17 (9th Cir.1998) (concluding that the petitioner's parents were firmly resettled in France where the petitioner did not become a French national but attended school there and "traveled abroad using French travel documents"). Camposeco asserts that his case is more similar to Andriasian than Cheo and *Vang*. We agree.

Camposeco certainly did not experience in Mexico the freedom and complete lack of "molestation or persecution" that seemed to characterize the applicants' stays in Cheo and Vang. *Cheo*, 162 F.3d at 1228. Moreover, his stay in Mexico was not "undisturbed" for purposes of establishing a presumption of firm resettlement. He was restricted by the Mexican government to the municipality in which his refugee camp was located. He was not allowed to attend Mexican schools and was threatened with repatriation to Guatemala. The evidence thus does not support the conclusion that a presumption of firm resettlement has arisen.[6] For the foregoing

---

6. Because we conclude that Camposeco has neither received an offer of permanent reset-

tlement nor experienced a lengthy, undisturbed residence in Mexico, leading to a pre-

reasons, we conclude that Camposeco has not firmly resettled in Mexico within the meaning of 8 C.F.R. § 208.15. Firm resettlement accordingly is not a bar to his asylum application. We therefore remand for the IJ to consider whether Camposeco is entitled to asylum.

## II. Withholding of Removal

 Camposeco contends that the IJ erred in concluding that he was not eligible for withholding of removal. "Failure to raise an issue below constitutes failure to exhaust administrative remedies and 'deprives this court of jurisdiction to hear the matter.'" *Farhoud v. INS,* 122 F.3d 794, 796 (9th Cir.1997) (quoting *Vargas v. United States Dep't of Immigration and Naturalization,* 831 F.2d 906, 907 (1987)). Unfortunately for Camposeco, he did not raise the withholding of removal issue in his brief to the BIA. We accordingly do not have jurisdiction to review this issue.

## III. Summary Affirmance by BIA

Under 8 C.F.R. § 1003.1(a)(7), the Board may designate certain cases as suitable for review by a single member of the Board, a process known as streamlining or summary affirmance. The regulation provides:

> The single Board Member to whom a case is assigned may affirm the decision of the Service or the Immigration Judge, without opinion, if the Board Member determines that the result reached in the decision under review was correct; that any errors in the decision under review were harmless or nonmaterial; and that
>
> (A) The issue on appeal is squarely controlled by existing Board or federal

court precedent and does not involve the application of precedent to a novel fact situation; or

> (B) The factual and legal questions raised on appeal are so insubstantial that three-Member review is not warranted.

8 C.F.R. § 1003.1(a)(7)(ii). If a BIA member streamlines a case, the decision of the IJ becomes the final agency determination; however, summary affirmance does not necessarily mean that the BIA has adopted or approved of the IJ's reasoning, only that the BIA approves the result reached. *Falcon Carriche,* 350 F.3d at 849; 8 C.F.R. § 1003.1(a)(7)(iii). Summary affirmance indicates "the Board's conclusion that any errors in the decision of the [IJ] or the[INS] were harmless or nonmaterial." 8 C.F.R. § 1003.1(a)(7)(iii).

Camposeco argues that the Board failed to follow its own regulation because streamlining is proper only when the IJ's error is harmless or nonmaterial, which was not the case here. Rather, the IJ made a clear error on a point the IJ considered to be critical. Camposeco thus argues that his case should be remanded for full review by a three-member panel of the Board rather than the single-member summary affirmance.

The INS argues that the BIA's decision to streamline is committed to the agency's discretion and therefore is not reviewable by this court, citing *Heckler v. Chaney,* 470 U.S. 821, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985), and *Lincoln v. Vigil,* 508 U.S. 182, 113 S.Ct. 2024, 124 L.Ed.2d 101 (1993).

 [6] We rejected the government's argument that the decision to streamline is inherently discretionary and

sumption of resettlement, we do not address whether either exception to firm resettlement

applies to him.

therefore unreviewable in *Falcon Carriche*. *Falcon Carriche*, 350 F.3d at 852. Thus, "[c]ontrary to the government's assertion, we have jurisdiction over [Camposeco]'s regulatory challenge to streamlining in his case." *Vukmirovic*, 362 F.3d at 1253. Nonetheless, "we need not reach the question of whether the regulations were violated in this case because it is moot, as we are granting the petition for review." *Id.*

## CONCLUSION

The IJ's conclusion that Camposeco is firmly resettled in Mexico is not supported by substantial evidence. Camposeco has waived the right to petition for review of his withholding of removal claim, although we note that, on remand, the IJ may wish to reconsider the decision and engage in the requisite individualized analysis of Camposeco's claim. Because we grant Camposeco's petition, we need not address the Board's decision to streamline.

**PETITION FOR REVIEW GRANTED.**